UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS

LEO WOMACK,                      )
                                 )
          Petitioner,            )
                                 )
     v.                          )          CIVIL ACTION
                                 )          No. 11-40138-TSH
JAMES SABA,                      )
                                 )
          Respondent.            )
                                 )

                       **REPORT AND RECOMMENDATION**

                              **March 2, 2015**

Hennessy, M.J.

     Petitioner Leo Womack ("Womack") has filed a petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254 challenging his state court conviction. (Docket #1). Pursuant to 28

U.S.C. § 636(b)(1)(B) and an Order referring the petition to me, (Docket #37), I recommend that

Womack's petition be denied and dismissed.

**I.      Factual Background**

     The facts underlying Womack's conviction, recounted here, are set out in the opinion of

the Massachusetts Supreme Judicial Court ("SJC").  Commonwealth v. Womack, 457 Mass. 268,

269-73 (2010).  The factual findings of the state court are presumed to be correct.  28 U.S.C.

§ 2254(e)(1); Scoggins v. Hall, 765 F.3d 53, 57 (1st Cir. 2014).

> At 3:49 A.M. on February 12, 2004, a man entered a 7-Eleven convenience store
> on Western Avenue in Lynn.  He approached the store clerk and demanded that
> he open the cash register.  He then stabbed the clerk once in the chest, stole about
> $403 in cash from the register, and fled.  The store clerk died as a result of the
> stab wound.  The incident was recorded by four security video cameras in the
> store.  The perpetrator's facial features were partially concealed by a hat and
> towel around his head.

The videotape showed the defendant entering the store twice shortly before the incident, first at 3:12 A.M. and again at 3:17 A.M. His clothing differed from that worn by the perpetrator, but his height, weight, and gait were similar. The perpetrator wore a pair of sneakers that were similar, based on seventeen points of comparison by an expert witness, to sneakers worn by the defendant on January 18, 2004, as seen on a videotape showing him inside that 7-Eleven store on that date. During his first entrance on February 12, the defendant's coat was open, he wore nothing on his head, and he purchased a fruit drink. When he entered the second time his coat was closed, he wore a hat pulled down over his face,[1] he made no purchase, and he appeared to be studying his appearance on the security camera monitor. At 3:37:59 and 3:41:09 A.M. on February 12, the defendant made two credit card purchases (gasoline, then cigarettes) at a Hess gasoline station ("Hess") that was an eight-to-ten-minute drive from the 7-Eleven store.

The defendant was arrested on February 14, 2004, after police obtained the videotape created by the security cameras in the store and recognized the defendant. Police searched his home for the clothing worn by the perpetrator, but found none. However, the defendant owned gloves, as well as sneakers, similar to those worn by the perpetrator.

The defendant waived his Miranda rights and spoke with police. He said he often went to this 7-Eleven store. When asked to describe his whereabouts in the early morning of February 12, the defendant began by saying he was awakened by the crying of his thirteen month old son. He yelled at his son, which resulted in an argument between the defendant and his wife. He said he left and went to the 7-Eleven store, arriving at about 2 A.M., and bought a fruit drink. He then went home. The defendant told the officers he had been inside the store only once that night. After he was confronted with photographs showing him inside the store a second time, he said he had returned to the store to buy diapers, then decided instead to return the next day after he received his paycheck. When asked why, after his first entrance into the store and before his second, he stood in the doorway for two seconds without entering, the defendant was silent, and the interview continued. He denied any involvement in the robbery and the killing. He never mentioned going to Hess after leaving the 7-Eleven store.

Before trial, the defendant was held as a pretrial detainee, sharing a cell with another inmate. That inmate testified that the defendant told him he had robbed the 7-Eleven store and stabbed the clerk. The inmate admitted that he expected consideration in his pending felony case from the district attorney in exchange for his cooperation in the prosecution of the defendant. He conceded that he could have reviewed the defendant's legal papers when they shared a cell, but he said he never in fact did so.

---

[1] The defendant would later tell police, "It was cold out," in response to their request to explain the hat and closed coat. Womack, 457 Mass. at 270 n.1.

The defendant offered alibi testimony of his wife to the effect that he went out between 2:25 and 2:30 A.M. on February 12, and returned within one hour.

. . .

Shortly after his arrest, the defendant was interviewed at the Lynn police station by Lieutenant Gerald Stevens of the Lynn police department and Lieutenant Norman Zuk of the State police. He was advised of the Miranda rights, he waived his rights, and he agreed to speak to the officers. The interview was not tape-recorded. [At trial,] Lieutenant Zuk testified that he advised the defendant that "he was under arrest because he was identified by Lynn police officers as being in the 7-Eleven store on Western Avenue just prior to a victim's being stabbed there, and that he fit the same height, weight and same gait, and some of the clothing that was observed was consistent." Defense counsel objected on grounds that this was an accusation, and the judge sustained the objection. There was no motion to strike Zuk's testimony.

The prosecutor rephrased his question and Lieutenant Zuk essentially repeated what he had said before, without objection. He further testified that he told the defendant that "the whole event was recorded on video and it was also recorded with audio, and you could hear him speaking and you could also hear the clerk scream when he was stabbed." The defendant responded by saying, "It wasn't me."

Later in his direct examination Lieutenant Zuk testified that he and Lieutenant Stevens showed the defendant three still photographs taken from the videotape. Lieutenant Zuk showed the defendant a photograph taken at 3:12 A.M. on February 12, depicting the defendant in the store with no hat and coat unzipped. He said to the defendant, "Here you are coming in, buying your drink. You're looking around." Defense counsel objected on grounds that the statements were accusations. The objection was overruled. Lieutenant Zuk continued, testifying that he showed the defendant a second photograph, taken at 3:17 A.M., and a third photograph, taken at 3:49 A.M., and said to him, "Here you are coming in, seeing what you might look like with a hat on and your coat zipped up. And you're checking yourself out in the monitor. You didn't like what you saw, so you went in and then you went out and got a towel to cover your face. You came back, you robbed the place, and you stabbed the clerk." The defendant responded, "I saw the news. I saw the papers. I saw the reward. I didn't do anything. I bought a juice."

Womack, 457 Mass. at 269-73 (footnote omitted).

## II.    Procedural History

On June 17, 2005, after a jury trial in Massachusetts Superior Court, Womack was convicted of felony-murder in the first degree based on an underlying felony of armed robbery while masked, and was sentenced to life imprisonment. (See Docket #1 p. 1); Womack, 457 Mass. at 269. Womack appealed his conviction directly to the SJC pursuant to Mass. Gen. Laws ch. 278, § 33E.[2] (See Docket #15 p. 2). On July 13, 2010, the SJC affirmed Womack's conviction and the denial of his motion for a new trial.[3] Womack, 457 Mass. at 282.

On July 14, 2011, Womack filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (the "petition"). (Docket #1). Concurrent with his petition, Womack filed a motion to stay the proceedings.[4] (Docket #2). On October 27, 2011, the Respondent, James Saba ("Saba"), filed a response to the petition, (Docket #13), and an opposition to Womack's motion to stay, (Docket #15). On October 28, 2011, Saba filed a supplemental answer, in two volumes, comprising relevant portions of the state record. (Docket #17).

---

[2] Womack also filed a motion to stay the appeal, as well as a motion for a new trial which was remanded to the Superior Court. (See Docket #15 p. 2). After the Superior Court denied Womack's motion for a new trial, he appealed; the appeal was consolidated with his direct appeal. (See id.).

[3] After his unsuccessful appeal to the SJC, Womack pursued further relief in the Superior Court. First, on February 22, 2011, Womack filed a motion for a new trial, discovery and an evidentiary hearing. (See Docket #15 p. 3). This motion was denied without a hearing and Womack subsequently appealed. (See id.). Next, on August 16, 2011, Womack filed an amended version of the same motion. (See id. p. 4). The motion was again denied; it does not appear that Womack sought to appeal this denial. (See id.). Finally, on September 29, 2011, Womack filed another motion for new trial, along with other motions. (See id.). This motion was denied as well; it is unclear if Womack has appealed this denial. (See id.). These motions presumably comprise Womack's "unexhausted" claims. See infra.

[4] In brief, Womack sought a stay of the habeas proceedings in order to exhaust various claims that were not presented to the SJC, with the intent that the claims – once exhausted – would ultimately be assimilated with the instant petition. (Docket #2).

On March 1, 2012, Judge Saylor issued a memorandum and order denying Womack's motion to stay the proceedings, reasoning that Womack had not established good cause for failing to exhaust his state-court remedies with respect to some of his potential grounds for seeking relief under 28 U.S.C. § 2254, and therefore denying the motion for a stay. (Docket #23 p. 8).

Thereafter, Womack sought to appeal Judge Saylor's decision. Initially, Womack filed a motion for a certificate of appealability ("COA"), (Dockets #24-26); however, Judge Saylor denied the COA, noting that Womack's "habeas petition has not been dismissed, and therefore the application is premature at best," (Docket entry on March 9, 2012). Subsequently, Womack sought leave to file an interlocutory appeal. (Docket #27). On July 12, 2012, Judge Hillman[5] issued an order denying Womack's motion, noting that the matter should proceed to a decision on the merits of the claims asserted in the petition. (Docket #32 pp. 4-5).

On November 2, 2011, prior to Judge Saylor's denial of Womack's motion to stay, Womack filed a motion for leave to file a memorandum of law in support of his petition, (Docket #18), which was granted by Judge Saylor, (Docket entry on March 1, 2012). To date, however, Womack has not filed a memorandum supporting his petition. Moreover, since Judge Hillman's order, neither Womack nor Saba has sought to file any documents in the case.

## III. Womack's Habeas Petition

Proceeding *pro se*, Womack's petition asserts two grounds for relief.[6, 7] First, Womack claims that "the trial judge committed reversible error when he admitted, over objection, a police

---

[5] On June 13, 2012, the case was reassigned to Judge Hillman. (Docket entry on June 13, 2012).

[6] Although proceeding *pro se* at this time, Womack was represented by counsel during his state court appeals. (Docket #23 p. 7 n.5).

5

officers['] extrajudicial accusatory hearsay statements made during a custodial interrogation, the defendant's blanket denials of those accusations and the defendant's silence," (Docket #1 p. 3)[8]; in addition, Womack argues that his "failure to mention his trip to Hess was irrelevant," (id. p. 4). Second, Womack asserts that "the trial judge committed reversible error in refusing to declare a mistrial despite evidence of juror intimidation." (Id. p. 3). As noted, despite seeking leave to do so, Womack has not filed a memorandum in support of his petition. Therefore, based on Womack's replication of the argument headings from his appeal to the SJC, the court will treat his brief to the SJC as his memorandum in support of his petition.[9] See, e.g., Copeland v. Mass. Dep't of Corr., Civ. No. 10-11215-DPW, 2014 U.S. Dist. LEXIS 31200, at *12 n.5 (D. Mass. Mar. 11, 2014) (upon request, court accepted petitioner's Application for Leave to Obtain Further Appellate Review at the SJC in lieu of memorandum in support of habeas petition).

## IV. Standard of Review

"Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a habeas petitioner must show that the challenged state court adjudication was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or that the decision 'was based on an unreasonable determination of

---

[7] While Womack's petition lists four grounds for relief, (see Docket #1 pp. 12, 15, 17, 20), grounds two and four are identical and will therefore be treated as a single claim for relief. Similarly, grounds one and three are identical except that Womack provides a different third subheading in ground three; therefore, these will be treated as a single claim for relief which will include the four different subheadings, each relating to an item of evidence. (See also Docket #23 p. 2; Docket #32 p. 1).

[8] Because Womack's "grounds" are merely the headings from his brief to the SJC, they are primarily written in all capital letters, but will be presented here in lower case for aesthetic reasons.

[9] See Docket #17 pp. 443-87, also numerated as SA-432 to SA-476 (Womack's Appeal Brief); see also Docket #17 pp. 566-86, also numerated as SA-553 to SA-573 (Womack's Reply brief to the SJC).

the facts.'" Pena v. Dickhaut, 736 F.3d 600, 603 (1st Cir. 2013) (quoting 28 U.S.C. § 2254(d)). This "highly deferential" standard of review "requires the petitioner to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error … beyond any possibility for fairminded disagreement'." Id. (quoting Burt v. Titlow, 571 U.S. __, 134 S. Ct. 10, 16 (2013)).

## IV. Discussion

### A. Preliminary Issues

This court is only permitted to "entertain an application for a writ of habeas corpus … on the ground that [Womack] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Simply put, "federal habeas corpus relief does not lie for errors of state law." Swarthout v. Cooke, 562 U.S. 216, 219 (2011) (quoting Estelle v. McGuire, 502 U.S. 62, 67 (1991)). Nonetheless, because "a state law or practice that betrays a fundamental principle of justice offends the Due Process Clause[,] … a state court's error in applying a state rule sometimes can have constitutional implications" and thus "may afford a basis for federal habeas relief." Sanna v. Dipaolo, 265 F.3d 1, 11-12 (1st Cir. 2001).

Here, Womack has not framed his claims in federal constitutional terms; with a few minor exceptions, Womack's brief and reply to the SJC and the SJC's decision rely exclusively on state law decisions. This failure subjects Womack's petition to dismissal in and of itself. See, e.g., Carrington v. Thompson, Civ. No. 13-12393-IT, 2014 U.S. Dist. LEXIS 131006, at *7-8 (D. Mass. Aug. 22, 2014). Regardless, and despite Womack's failure to file a memorandum explicating his habeas grounds, this court will generously presume that Womack intends to cast his claims as state law errors rising to the level of constitutional violations; accordingly, Womack's claims will be reviewed on the merits. See, e.g., id., 2014 U.S. Dist. LEXIS 131006,

7

at *9 ("[a]ffording [petitioner] a liberal construction of the petition in light of his *pro se* status, ground two presents a federal constitutional claim[;] . . . [a]ccordingly, this court turns to the merits").

B. The Admission of the Contested Evidence was Harmless

Womack's first ground for relief claims that the trial judge committed reversible error by admitting certain pieces of evidence, including: (1) accusatory statements by police and Womack's subsequent denials; and (2) Womack's silence and failure to mention his trip to Hess. (Docket #1 pp. 3-4). Generally, such state law evidentiary issues "are not cognizable under federal habeas review." Kater v. Maloney, 459 F.3d 56, 64 (1st Cir. 2006). However, in certain circumstances, "[a]n erroneous evidentiary ruling that results in a fundamentally unfair trial may constitute a due process violation and thus provide a basis for habeas relief." Lyons v. Brady, 666 F.3d 51, 55 (1st Cir. 2012). "But to trigger such relief, the state court's application of state law must be 'so arbitrary or capricious as to constitute an independent due process … violation.'" Coningford v. Rhode Island, 640 F.3d 478 484 (1st Cir. 2011) (quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990)). "[R]eview of such challenges is severely limited." Abrante v. St. Amand, 595 F.3d 11, 18-19 (1st Cir. 2010). Indeed, in order "[t]o be a constitutional violation, a state evidentiary error must so infuse the trial with inflammatory prejudice that it renders a fair trial impossible." Petrillo v. O'Neill, 428 F.3d 41, 44 n.2 (1st Cir. 2005).

With respect to Womack's first ground for relief, the analysis is controlled by Petrillo v. O'Neill. In Petrillo, the petitioner sought habeas review of a Massachusetts Appeals Court decision affirming the petitioner's underlying conviction. Id. at 43-44. The Appeals Court, despite ruling that evidence against the petitioner was admitted improperly, held that the

8

admission constituted harmless error.[10]  Id.  The petitioner sought habeas review, and this court denied him relief.  Id. at 44.  On appeal, the First Circuit affirmed, explaining that, "even assuming *arguendo* that the error was of constitutional proportion, the state appeals court, in upholding the conviction, chose and applied the correct standard of review for constitutional error, asking by implication whether the error was harmless beyond a reasonable doubt and deciding, in effect, it was not."  Id.  Accordingly, the First Circuit cast the applicable analysis as follows:

> On direct appeal, a state court confronted by a preserved constitutional error must set aside the judgment unless it is satisfied that the error was harmless beyond a reasonable doubt.  A federal habeas court is bound to uphold a state court judgment as long as the error did not have a substantial, injurious effect on the jury's verdict.

Id. at 44-45 (quotations and citations omitted); see also Isabelle v. Mansfield, 568 F. Supp. 2d 85, 98 (D. Mass. 2008) ("habeas petitioners … are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice[;] … [m]oreover … the evidence of guilt does not have to be overwhelming – weighty evidence of guilt will suffice if in light of the record as a whole … the admission of impermissible testimony did not have a substantial and injurious effect") (quoting Brecht v. Abrahamson, 507 U.S. 619, 638-39 (1993)).  In view of this standard, the First Circuit determined that the Appeals Court correctly found that the error was not substantial and injurious because, for instance, the evidence might have bolstered the defense theory of the case and the other evidence against petitioner was strong.[11]  Petrillo, 428 F.3d at 45.

---

[10]  The decision of the Appeals Court was denied further appellate review by the SJC and was denied *certiorari* by the United States Supreme Court.  Petrillo, 428 F.3d at 44.

[11] The First Circuit has reached similar conclusions on other occasions.  See, e.g., Delaney v. Bartee, 522 F.3d. 100, 105 (1st Cir. 2008) (affirming denial of habeas relief despite improper

With this background in mind, the court turns to the contested evidence.

1.  Accusation and Denials

The SJC found that two accusations made against Womack, as well as his denials thereof, were improperly admitted in evidence. Specifically, the SJC explained that:

> Turning to the claims of error, we need not define the precise limits of an accusation because Lieutenant Zuk's statements called for an admission or a denial of a single fact, *i.e.*, the identity of the perpetrator, which was the only question in dispute. In each instance Lieutenant Zuk asserted first indirectly, then directly, that the defendant committed the robbery and homicide. If the defendant admitted either assertion, he effectively would have confessed to the crimes. These pointed assertions are clear accusations that the defendant robbed and killed the store clerk, both of which were unequivocally denied by the defendant. As such, neither should have been admitted.

Womack, 457 Mass. at 274 (footnotes and citation omitted).

However, as the SJC explained in a thorough and reasoned manner, the evidentiary errors were ultimately harmless in view of the substantial amount of properly admitted inculpatory evidence.[12] Indeed, if anything, evidence of Womack's denials of the accusations more likely helped than hurt his case. According to the SJC:

> There was no substantial likelihood of a miscarriage of justice, or prejudice, respectively, from the admission in evidence of these accusations because they were cumulative of other evidence. The jury heard evidence from Lieutenant Stevens and Lieutenant Zuk that, based on their examination of the videotape and the photographs, in their respective opinion the defendant and the perpetrator were similar in height, weight, and gait. The jury could examine the photographs and the videotape, which had been played during the trial and again during the prosecutor's closing argument, and determine for themselves if the person who

---

admission of evidence because "[g]iven [the] overwhelming evidence of a guilty conscience … the two [improper] additional questions posed by the prosecution did not have a substantial and injurious effect or influence in determining the jury's verdict" (quotation omitted)); Evans v. Verdini, 466 F.3d 141, 146 (1st Cir. 2006) (affirming denial of habeas petition where "[t]he SJC held, nonetheless, that the error in admitting the … testimony was harmless, given that the defendants and another witness had testified that [petitioner] was at [the crime scene] on the night in question.").

[12] In reaching this decision, the SJC applied the prejudicial error standard. See Womack, 457 Mass. at 274.

robbed and killed the store clerk was the defendant. Indeed, the videotape evidence was the centerpiece of the prosecutor's closing, and he argued essentially what Lieutenant Zuk had stated as his theory of what occurred. The theory of the case was made more forcefully and compellingly by the prosecutor in his closing argument.

Also weighing against prejudice was the availability of Lieutenant Zuk, the accuser, for cross-examination about his observations of the videotape and photographs, and the availability of the videotape and the photographs as exhibits. Other evidence supported a finding that the defendant actually committed the crime, including his statement to police (which the jury could have found implausible) that he zipped his coat and pulled his hat over his head before making his second entrance (but not his first entrance) because "[i]t was cold out." This evidence, together with his behavior as seen on the videotape during his second entrance, suggests that he was concerned about being identifiable on the video monitor, a concern the jury could determine generally is not shared by the ordinary convenience store patron. In addition, evidence that the defendant admitted being in the store once but changed his story after having been confronted with evidence of the still photographs from the video camera, together with his failure to mention Hess …, suggests he was purposefully withholding information he thought the police did not know. Collectively, this was evidence from which the jury could infer a guilty mind as to matters relevant to the case. The jury also heard evidence from a photographic technologist employed by the Federal Bureau of Investigation, who analyzed the videotapes of the robbery and assessed the height of the perpetrator as five feet, eleven inches, the same height as the defendant; and there was expert testimony that sneakers owned by the defendant and the perpetrator were similar. There was no prejudice.

Neither did the admission in evidence of the defendant's denials cause prejudice. The core of any prejudice is more likely caused by admission of the accusations than the denials. The jury were able to hear evidence of his prompt, clear, and emphatic denials without his having to testify, something generally of great value to defendants. Where the premise of the defense was misidentification, evidence of his denials did not likely harm his case.

We conclude there was no prejudice in the admission of the accusation and denial evidence.

Womack, 457 Mass. at 275-76 (citations omitted).

The SJC's decision is entitled to substantial deference, and simply put, there is no reason apparent in the record for this court to undermine it. In the absence of a memorandum in support of Womack's petition, the court is left with only his arguments to the SJC – the same arguments

11

which were soundly rejected in a careful and detailed opinion. In light of the weighty evidence of Womack's guilt properly introduced at trial, there is no reason to believe that the jury would have reached a different conclusion in the absence of the contested evidence. Moreover, there is simply no basis upon which to find that Womack has suffered from an error of constitutional magnitude. The court agrees with the SJC, and sees no basis for any conclusion that this evidence unfairly prejudiced Womack, much less that the trial was fundamentally unfair. See Petrillo, 428 F.3d at 44 n.2. Therefore, the court recommends that, as to the improperly admitted accusations and denials, Womack's petition should be denied and dismissed.

    2.      Womack's Silence and Failure to Mention Hess

Further, the SJC found that evidence regarding Womack's silence and failure to mention his trip to the Hess station were properly admitted by the trial court. Specifically, Womack asserted that his right to remain silent had been violated on three occasions, including: (1) his refusal to sign a statement; (2) his silence when asked why he appeared in the 7-11 store doorway, but did not enter; and (3) his failure to tell the police that he had been to Hess, which the prosecution asserted in closing was an attempt to construct a false alibi. Womack, 457 Mass. at 276-77.

In short, the SJC held that "none of these incidents was an impermissible comment on an exercise of his right to remain silent, Doyle v. Ohio, 426 U.S. 610, 617-618 (1976)), because the defendant did not exercise his right to remain silent." Womack, 457 Mass. at 277. Instead, Womack "waived that right after being advised of his Miranda rights, and he agreed to speak to police;" moreover, "[a]t no time during the ensuing interview did [Womack] exercise his right to remain silent." Id. In the absence of an evidentiary error, the SJC did not review for a

miscarriage of justice. See id. ("we review to determine if there were error and, if so, whether it created a substantial likelihood of a miscarriage of justice").

The SJC's determination circumscribes this court's review. Specifically, "because the admission of the [evidence] was not error, [Womack] necessarily fails to meet the high bar set in Petrillo to demonstrate that an error amounted to a violation of constitutionally protected due process rights." Williams v. Marshall, 317 Fed. Appx. 12, 16 (1st Cir. 2008). Moreover, in light of the weighty and cumulative evidence against Womack, it is unlikely – at best – that Womack could show, "even assuming that … the admission and use of the [evidence] was error, … that it was an error of constitutional magnitude that deprived him of due process and entitles him to habeas relief." Id. Again, this court can find no reason – nor has Womack provided one – to question the cogent decision of the SJC. As such, the court finds that Womack has not suffered an evidentiary error – let alone one that rises to the level of a constitutional violation. See id. Therefore, the court recommends that, as to the properly admitted silence and failure to mention the trip to Hess, Womack's petition should be denied and dismissed.

C. The Denial of a Mistrial was Within the Trial Court's Discretion

In his second ground for relief, Womack challenges the trial judge's failure to declare a mistrial in light of evidence of potential juror intimidation. "At the beginning of the fifth day of trial the judge told the parties he had received reports that spectators in the court room, possibly friends or family members of the defendant, made comments that were overheard by [two] jurors that were at best inappropriate, and 'smack[ed] of juror intimidation.'" Womack, 457 Mass. at 278. In response, the judge addressed the jury as a group and then proceeded with an individual voir dire of the jury.[13] Id. at 278-79. The SJC noted that "[d]efense counsel did not object to any

---

[13] The voir dire produced the following responses:

portion of the voir dire," although "[h]e expressed his separate satisfaction with each individual voir dire, and with the voir dire generally;" moreover, defense counsel "did not move for a mistrial." Id. at 280. Against this background, Womack claims that the judge erred by not declaring a mistrial; specifically, Womack "reasons that the individual voir dire was inadequate because the judge failed to follow the prescribed course for deciding whether jurors have been exposed to extraneous information." Id.

To the contrary, the SJC determined that "[t]he judge's collective inquiry of the jury comported generally with the procedure this court recommend[s]," and that "any error likely would have been exposed by the ensuing individual voir dire, which also comported with the procedure called for."[14] Id. at 281. The SJC characterized the applicable procedure as follows:

> When a judge determines that the jury may have been exposed *during the course of trial* to material that goes beyond the record and raises a serious question of

---

> All but four of the thirteen jurors heard nothing that caused them any concern. Juror 5 expressed being "a little concerned when I leave …. There seems to be a lot of people in the area that are just kind of staring down." Juror 5 stated such feelings would not create any difficulty in continuing to serve as a juror, and juror 5 assured the judge of continued objectivity. Juror 7 stated, "[W]hen we walk in or come back from lunch, they horde around the front of the building. They don't easily let you pass. And there are comments made … [such as] 'That's one of the jurors.' And then I just try and walk fast." Juror 7 assured the judge, "I still have the ability to make a rational decision." Juror 10 said a spectator from the court room asked, "How's your day?," when the juror walked out of the court house on the first day. The juror felt uncomfortable, but said it would not affect "my ability" to be fair and impartial. Juror 12 expressed discomfort the previous day over spectators "gathering outside the court room when we're trying to leave, and the possibility that … they'll see where our cars are parked." The juror thought "they" might be related to the defendant by reason of skin color. Juror 12 assured the judge that this experience would not affect the juror's ability to remain fair and impartial.

Womack, 457 Mass. at 279-80 (footnote omitted).

[14] In reaching this conclusion, the SJC noted that "[a] judge has discretion in this area, including whether to declare a mistrial," and reviewed the judge's rulings for an abuse of discretion. Womack, 457 Mass. at 280-81.

14

possible prejudice, he should conduct a voir dire of jurors to ascertain the extent of their exposure to the extraneous material and to assess its prejudicial effect. The initial questioning concerning whether any juror saw or heard the potentially prejudicial material may be carried out collectively, but if any juror indicates that he or she has seen or heard the material, there must be individual questioning of that juror, outside of the presence of any other juror, to determine the extent of the juror's exposure to the material and its effects on the juror's ability to render an impartial verdict.

Id. at 280 (quotations and citations omitted) (emphasis in original). In the SJC's estimation, this procedure was followed:

Each juror was asked if he or she had overheard anything or received any communication that may have caused that juror any concern during the trial. Additionally, each juror was asked if he or she could continue to be objective and consider the case without any particular concern or fear. This would have included the judge's prefatory comments. The judge was entitled to rely on each juror's statement that he or she remained unaffected and impartial.

We give deference to the judge's decision allowing each juror to remain seated, which implicitly meant that he determined that each juror remained impartial. We conclude that the defendant has failed to show that any error in the manner in which the judge addressed the jury collectively resulted in a substantial likelihood of a miscarriage of justice, or that the judge abused his discretion in the manner in which he conducted the individual voir dire of the jury. We further conclude that there was no abuse of discretion in the retention of the jurors. There has been no showing of any need to declare a mistrial.

Id. at 281 (citations omitted). Womack seeks review of these conclusions.

To begin, "this habeas court has very limited authority to review voir dire questions in state court cases." Silva v. Roden, Civ. No. 11-10944-JGD, 2014 U.S. Dist. LEXIS 138256, at *40-41 (D. Mass. Sept. 29, 2014). Specifically:

The Supreme Court has explained that federal authority over voir dire in cases tried in state courts is "limited to enforcing the commands of the United States Constitution." Mu'Min v. Virginia, 500 U.S. 415, 422 (1991). So far, the Supreme Court has recognized a defendant's constitutional right to voir dire questioning only about whether jurors might be prejudiced against defendant because of his race. See Ham v. South Carolina, 409 U.S. 524, 526-27 (1973).

15

Id., at *41 (quoting Kater, 459 F.3d at 66). Womack does not assert any potential prejudice due to his race; thus, Womack's challenge to the voir dire does not rise to the level of a federal constitutional claim, and to the extent that he is alleging an error based on state law, it is not within the reach of his federal habeas petition. Id. at *41-42; see Sargent v. Bissonnette, Civ. No. 03-11124-RGS, 2011 U.S. Dist. LEXIS 15840, at *36-37 (D. Mass. Jan. 10, 2011) (finding that alleged voir dire error regarding neither race nor the death penalty did not state a constitutional claim appropriate for habeas review). Thus, Womack has not raised a cognizable claim for this court to review. Womack's petition is subject to denial and dismissal on this basis alone. Nonetheless, Womack's claims will be evaluated on the merits.

Womack faces an uphill battle in establishing that the trial court's voir dire process resulted in a constitutional violation, let alone that the SJC's evaluation of his claim was erroneous. See, e.g., Palmariello v. Superintendent of MCI Norfolk, 873 F.2d 491 495 (1st Cir. 1989) (noting that habeas court's "capacity to review the trial court's actions where juror bias is at issue is … quite limited;" the court must "restrict [itself] to a single fundamental query, whether the procedures adopted by the state court were sufficient to determine whether [further] jury inquiry was necessary to resolve questions of bias") (internal quotation omitted)

Simply put, Womack has not carried his considerable burden. First, given the substantial deference paid to the decisions of the trial judge, Womack has not provided any basis upon which to find that the procedures adopted by the state court were insufficient to determine whether further jury inquiry was necessary to resolve questions of intimidation. See id. Similarly, Womack has not established any basis for disturbing the SJC's finding that the trial judge took sufficient steps to seat a fair and impartial jury. See Silva, 2014 U.S. Dist. LEXIS 138256, at *43. Finally, the court can discern no reason to question the thorough and considered

decision of the SJC, which found no abuse of discretion by the trial judge, let alone an error resulting in a substantial miscarriage of justice. Therefore, the court recommends that, as to voir dire, Womack's petition should be denied and dismissed.

Without an error in the voir dire process, Womack has no colorable claim that a mistrial should have been declared. The SJC concluded that there had been no showing of any need to declare a mistrial, and this court can detect no reason to find otherwise. Thus, this court finds that the SJC's determination that the trial court properly exercised its discretion in denying Womack's motion for a mistrial was entirely correct. Therefore, the court recommends that, as to a mistrial, Womack's petition should be denied and dismissed.

## V.    Conclusion

For the foregoing reasons, I recommend that Womack's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 be denied and dismissed.[15]

/s/David H. Hennessy
David H. Hennessy
United States Magistrate Judge

---

[15] The parties are hereby advised that, under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court **within fourteen (14) days** of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objections are made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); see also Thomas v. Arn, 474 U.S. 140 (1985).